Chief Justice Chase
delivered the opinion,of the court:
The captured and abandoned [property act of March 12, 1863, under which the claim, in this case was made, has been frequently under the consideration of the court. In the several cases decided during this term, and especially in the case of United States v. Anderson, (supra,) it has been held to be remedial in its nature, requiring such a liberal construction as will give effect to the beneficent intention of Congress. That intention was that all property captured or found abandoned during the war, after the date of the law, should be turned into money under the direction of the Treasury Department, and that the proceeds should be placed in the Treasury, subject to the right of any person, preferring a claim against any portion of the property, to have the net proceeds restored to him on proof of his ownership, of his right to the proceeds, and that he never gave any aid or comfort to the rebellion.
A later act, passed since the petition of Padelford was filed in the Court of Claims, requires every claimant under the original act to prove affirmatively that he constantly adhered to the United States during the rebellion, and gave no aid or comfort to persons engaged in it. We do not think that this act changed essentially the nature of the proof required of claimants by the former act. The particular description of proof required by the later act seems to be included in the more general description of the earlier. Questions arising under the act of 1868, therefore, need not be further considered in this connection. The *146 record exhibits the findings of fact by the Court of Claims and. its conclusions of law. Among these findings is one that the petitioner “never gave any voluntary aid or comfort to the late rebellion,” * * * unless certain facts, also found, constitute in law such aid and comfort. < On the part of the Government it is objected to this finding that it is insufficient, because the statute authorizes relief only on proof that no aid or comfort was given. \ But we think otherwise. It would violate the soundest maxims of interpretation if we were to construe the act so as to deprive claimants of the benefits intended to be given by it, because of aid and comfort to the rebellion not voluntarily given.
But the court also find that the petitioner executed as surety three official bonds, two of commissaries and one of a quartermaster in the military service of the so-called Confederate' States, from motives of personal friendship to the principals. No compulsion is alleged. On the contrary, these acts are found to have been voluntary. We cannot doubt that these facts did constitute aid and comfort to the rebellion within the meaning of the act. The finding of the court, qualified as it was, is a virtual finding that the petitioner did give such aid and comfort.
The general facts found of opposition to the rebellion, so far as opposition would be tolerated, and of earnest good will to the National cause, establish, doubtless, a strong claim upon the favorable consideration of Congress, but do not warrant the courts in relaxing, by a forced interpretation, a rule which Congress has established for the guidance of the Court of Claims in passing upon claims to the proceeds of abandoned or captured property. But, in our judgment, it was not necessary to' determine this point'in this case.
The Court of Claims, in addition to the facts already referred to, found that the cotton was stored in Savannah at the time-of its capture, on the 21st of December, 1864 ; that one-half belonged to the claimant 5 and that “afterward, on the 18th of January, 1865, before any actual seizure or taking possession of the property in question by the military authorities, otherwise than by the capture of the city, the claimant did, in due form of law, take and subscribe the oath of amnesty and allegiance to the United States Government prescribed by the President’s proclamation of December 8,1863, issued in pur *147 suance of the thirteenth section of the act of Congress, approved July 17,1862$ that he was not, as to his person or property, within the exceptions of the said proclamation; and that he thenceforth complied with all the requirements and conditions named in the said act and proclamation, and kept and maintained said oath of allegiance and amnesty inviolate.’7 Upon this finding several questions arise. And, first, was the property of the petitioner captured, within the meaning of the act, before it was actually seized and taken into military possession ? As early as the 3d of July, 1863, the Secretary of the Treasury, in a circular letter of instructions, (Acts, &c., p. 33,) addressed to the supervising special agents of the Department, charged with the duty of collecting abandoned and captured property under the Act of March 12, 1863, defined captured property as property u which had been seized or taken from hostile possession by the military and naval forces of the United States.” This definition must be taken as the interpretation practically given to the act by the department of the Government charged with its execution; and we think it correct. In the case of Mrs. Alexander’s Cotton, (2 Wallace, p. 404,) it was determined that cotton, though private property, was a proper subject of capture by the National forces during the recent civil war. The court regarded this particular species of property as excepted, by its peculiar character and by circumstances, from the general rule of international law which condemns the seizure of the property of private persons nob engaged in actual hostilities, though residing in a hostile territory or region. But the case contains no intimation that such property can be considered as captured before actual seizure. The rule, we think, is otherwise. Bights of possession in private property are not disturbed by the capture of a district of country, or of a city or town, until the captor signifies by some declaration or act, and, generally, by actual seizure, his determination to regard a particular description of property as not entitled to the immunity usually conceded in conformity with the humane maxims of public law. >
Bights of possession in public property belonging to the hostile organization, or used in actual hostilities, depend on different principles. Such rights are transferred at once to the captor upon the capture of the place in which the property may be. The principles just stated in respect to private prop *148 erty may be further illustrated by reference to the case of The Venice, (2 Wallace, p. 278.) That vessel, with a cargo of cotton, was lying in Lake Pontchartrain at the time of the capture of New Orleans, and was, doubtless, within the discretion of the Captors, subject to seizure, though private property. But Flag-Officer Farragut and Major-General Butler, commanding, respectively, the naval and military forces of the Union, thought proper to give distinct assurances, before and after surrender, of safety and protection to the rights of persons and property. And this court held that these assurances expressed the general policy of the Government to respect and enforce those rights, whenever, in any part of the insurgent country, the authority of the National Government should be fully re-established. In accordance with these principles, the Yenice and her cargo, which were seized, some days after the capture of the city, by a ship of war of the United States, were restored by the decree of this court to their private owner.
Applying the principles above stated to the case before us, three propositions seem to be established:
1. That the cotton of the petitioner was, by the general policy of the Government, exempt from capture after the National forces took possession of Savannah.
2. That this policy was subject to modification by the Government, or by the commanding general, in the exercise of his military discretion.
3. That the right of possession in private property is not 'changed, in general, by capture of the place where it happens to be, except upon actual seizure in obedience to the orders of the commanding general.
It appears, as matter of fact, that the property of the petitioner was not seized until after the 18th of January, 1865. Whether it was then seized in pursuance of any order, either particular or general, emanating from competent military authority, does not appear. But we may assume that it was. Anri, then, the next question in this case is to be considered, namely, what was the condition or status of the petitioner at that time, and how far was the liability of his property to seizure affected by that status or condition ? The findings of the court show clearly enough that the petitioner disapproved of the rebellion, opposed it as far as he thought opposition prudent or safe, and was gratified by the restoration of the *149 National authority. It appears, further, that on the 18th of January, 1865, he testified' his adhesion to the constitutional Government of the Union by taking the oath prescribed by the proclamation of pardon issued by President Lincoln on the 8th of December, 1863, (13 Stat. L., p. 737;) that he was not within any of the exceptions of the proclamation; and that he has faithfully kept his oath. This proclamation, if it needed legislative sanction, was fully warranted by the Act of July 17, 1862, (12 Stat. L., p. 592, § 13,) which authorized the President, at any time thereafter, to extend pardon and amnesty to persons who had participated in the rebellion, with such exceptions as he might see fit to make. That the President had power, if not otherwise, yet with the sanction of Congress, to grant a general conditional pardon, has not been seriously questioned. And this pardon, by its terms, included restoration of all rights of property, except as to slaves and as against the intervening rights of third persons.
Now, we have already seen that, at the time when the petitioner took the prescribed oath, no right of any third party had intervened; for even if it could be admitted that a right of the Government derived from capture is an intervening right of a third person, within the meaning of the proclamation, it is certain that no such right accrued to the Government until actual seizure, which was after the pardon had taken full effect. In the case of Garland, (4 Wall., 380,) this court held the effect of a pardon to be such u that, in the eye of the law, the offender is as innocent as if he had never committed the offense;” and in the case of Armstrong’s Foundery, (6 Id., 769,) we held that the general pardon granted to him relieved him from a penalty which he had incurred to the United States. It follows that at the time of the seizure of the petitioner’s property he was purged of whatever offense against the laws of the United States he had committed by the acts mentioned in the findings, and relieved from any penalty which he might have incurred. It follows, further, that if the property had been seized before the oath was taken, the faith of the Government was pledged to its restoration upon the taking of the oath in good faith. We cannot doubt that the petitioner’s right to the property in question, at the time of the seizure, was perfect, and that it remains perfect notwithstanding the seizure.
But it has been suggested that the property wms captured in *150 fact, if not lawfully, and that the proceeds having been paid into the Treasury of the United States, the petitioner is without remedy in the Court of Claims, unless proof is made that he gave no aid or comfort to the rebellion. The suggestion is ingenious, but we do not think it sound. The sufficient answer to it is that after the pardon no offense connected with the rebellion can be imputed to him. If, in other respects, the petitioner made the proof which, under the act, entitled him to a decree for the proceeds of his property, the law makes the proof of pardon a complete substitute for proof that he gave no aid or comfort to the rebellion. A different construction would, as it seems to us, defeat the manifest intent of the proclamation and of the act of Congress which authorized it. Under the proclamation and the act the Government is a trustee, holding the proceeds of the petitioner’s property for his benefit; and having been fully reimbursed for all expenses incurred in that character, loses nothing by the judgment, which simply awards to the petitioner what is his own. These views require the affirmance of the judgment of the Court of Claims, and it is accordingly affirmed.